**WO**

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas G. Scheitlin, | ) No. CV-08-02342-PHX-FJM |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Freescale Semiconductor, Inc., a Delaware corporation, | ) |
| Defendant. | ) |

The court has before it defendant Freescale Semiconductor, Inc.'s motion for summary judgment (doc. 52), plaintiff Douglas Scheitlin's response (doc. 61), and defendant's reply (doc. 77). We also have before us plaintiff's errata (doc. 81). We granted the motion for summary judgment at our Final Pretrial Conference on May 28, 2010 with a written order to follow (doc. 105). This is that order.

**I. Background**

Plaintiff worked as a technician and an engineer for defendant and its predecessor, Motorola, from 1978 until his termination in November 2007. He worked in a section of defendant's Microwave & Mixed-Signal Technology Laboratory ("MMSTL") in Tempe, Arizona. For the last several years of his employment, he developed and operated a millimeter wave laboratory. His work involved high frequencies in the 60 to 100-plus

Gigahertz range. Plaintiff's data supported a radar team in Munich, Germany and, to a lesser degree, a Tempe-based radar group under Margaret Huang.

In September 2007, Saied Tehrani assumed responsibility for the MMSTL. Huang and Colin McAndrew reported to Tehrani as members of his staff. McAndrew was in charge of several groups, including one in Geneva, Switzerland and one managed by Ania Zlotnicka in Tempe. Beneath Zlotnicka, Marcel Tutt managed approximately five engineers, including plaintiff. In conjunction with the sale of a line of business to another company, Tehrani announced a "redeployment" on October 22, 2007. About twenty-two employees were affected, but they were not named. In the weeks leading up to the announcement, Tehrani and his staff met about four times to plan the redeployment. The affected employees were to be provided about one month to find another position internally, with or without management's assistance. Employees without new positions would be laid off. McAndrew identified seven people who worked under him for redeployment, including plaintiff.

McAndrew says that his decisions were based on defendant's ongoing needs and employee ratings and performance. No one in the meetings objected to plaintiff's inclusion on the redeployment list. McAndrew says that he was aware of criticism of plaintiff's interpersonal skills from Tutt and Huang. As detailed below, Tutt made several critical comments about plaintiff's interaction with others in a 2006 performance review. Huang, who apparently had issues with her scheduled access to the millimeter wave laboratory and plaintiff's role as the primary contact with the Munich team, says that she indicated to McAndrew that "Mr. Scheitlin was not a team player, did not work well with the employees under my supervision, did not listen to others' opinions." DSOF, Ex. N at 1. Huang was herself difficult to work with, according to plaintiff, Tutt, and Zlotnicka. McAndrew did not consult performance reviews or educational levels during the selection process. He also did not receive input from Tutt or Zlotnicka concerning his selections. They considered plaintiff's millimeter wave experience to be important, and Tutt was shocked when he learned that plaintiff had been selected for redeployment.

1    Cheryl Lewis, a Human Resources representative, participated in the meetings and
2 compiled a spreadsheet listing the affected employees. Plaintiff offers an October 3, 2007
3 email from Lewis to the staff-level managers asking for a brief summary of the employees'
4 skills in order to facilitate finding them other positions. PSOF, Ex. 28 at 4. On October 21,
5 Lewis distributed the spreadsheet to a human resources team to garner internal interest in the
6 affected employees. She noted that the employees were not yet aware of their inclusion on
7 the list, and reminded the recipients to keep the list confidential and restrict its distribution.
8 The list identified employee names, supervisors, departments, job levels, hire dates, ratings,
9 and skills. Plaintiff's rating was a 3, which corresponded to "Effective" or "relative
10 performance including results and/or behaviors needs to improve to increase overall
11 contribution." DSOF ¶ 11. His skill summary was "relationship issues. Mm wave, but need
12 talent upgrade." PSOF, Ex. 28 at 2.

13    When McAndrew selected plaintiff for redeployment, he expected to replace him with
14 Mike Majerus, another engineer under Tutt whose work was focused on the line of business
15 being sold. McAndrew interviewed and hired Majerus back to defendant in early 2007 based
16 on strong recommendations. Majerus was originally hired by Motorola in 1983, after he
17 completed a two-year technician program at DeVry Institute of Technology. Majerus worked
18 as a technician and an engineering aide until he left for Maury Microwave in 1997. He
19 returned to Motorola in 1999 and then left again in 2004 to work for a startup company.
20 When he was hired back by McAndrew, it was at the same engineering level as plaintiff.
21 Majerus had experience with the methodologies used in the millimeter wave laboratory, but
22 he did not have plaintiff's experience working with high frequencies. Like Majerus, plaintiff
23 attended DeVry Institute of Technology. He completed a Bachelor of Science in Electronic
24 Engineering in 1978.

25    Before 2004, the company used a five-point performance review system that did not
26 involve a forced distribution. Plaintiff and Majerus apparently received a consistent rating
27 of 2 or "Excellent" under this system. In 2004, the company instituted a forced distribution
28 rating system with a strict percentage breakdown of 15/60/20/5 across four categories: 1-

"Outstanding," 2-"Excellent," 3-"Effective," and 4-"Needs Improvement." Plaintiff received a 3, 2, and 3 from 2004-2006. Majerus was not evaluated under this system until year-end 2007 due to his time away from the company.

Plaintiff's 2006 review, completed by Tutt, included multiple comments about his interpersonal skills: "Good interaction with Munich. Need to be aware of what other customers want and how to interact," "When working with others, sometimes perceived as not willing to listen to others ideas. Tends to interrupt people not letting them complete their thoughts. This causes some people to not want to work with him," and "Care needs to be taken when interacting with customers. You often come across aggressively which tends to discourage people from interacting with you." PSOF, Ex. 11 at 65-66. The review concluded, "I think that part of the issue is due to his self-confidence and eagerness he comes across as having all the answers. Increased awareness of how he interacts with others will help address this." Id. at 66. Tutt also noted the strength of plaintiff's millimeter wave abilities. Plaintiff concedes that his interpersonal skills were part of his job performance and that teamwork and working well with others were important elements of his position.

McAndrew informed plaintiff that he had been selected for redeployment on October 24, 2007. He told plaintiff that he was eligible to apply for other positions in the company and that he was looking into available positions for plaintiff. When plaintiff asked why he had been selected, McAndrew stated only that the decision had been made by the staff. McAndrew confirmed for plaintiff that his job was not "going away." DSOF ¶ 61. According to plaintiff, McAndrew also confirmed that plaintiff was being replaced by someone "younger with less experience." Id. ¶ 61. Plaintiff allegedly told him that it was a violation of his rights and that McAndrew would be dealing with his lawyer. PSOF-2 ¶ 61. Plaintiff sent an email the following morning confirming some of these points, to which McAndrew did not respond. At the time, plaintiff was 57, and Majerus was 44.

On Monday, October 29, plaintiff sent McAndrew another email asking for contacts to find a new position. McAndrew responded the same day with some job descriptions and wrote that he was not sure how close plaintiff's background was. He also requested a

1 resume. The positions were either a poor fit with plaintiff's skills or were already filled. On
2 Tuesday, plaintiff wrote back that he would put together a resume by the end of the week and
3 suggested that it was odd that McAndrew did not already have the information as a part of
4 the redeployment process. On Wednesday afternoon, McAndrew left plaintiff a telephone
5 message asking him to come by his office and informing him that an individual in the Radio
6 Frequency Division had said that he did not have any jobs available yet.

7 Late Wednesday afternoon, McAndrew apparently learned from Tehrani that the
8 names of people selected for redeployment were posted on plaintiff's whiteboard in his
9 cubicle. McAndrew went to plaintiff's cubicle and erased the whiteboard. He says that, in
10 his opinion, it was a "breach of confidential proprietary information" to make the names
11 available. PSOF, Ex. 5 at 108. He was also concerned that a Geneva employee's name was
12 listed even though he had received a reprieve and had not been informed that he was
13 originally selected for redeployment. Id. at 111. McAndrew says that Tehrani asked him to
14 terminate plaintiff twice. Id. at 107. Tehrani says that he recommended removing plaintiff
15 from his duties based on his concern that plaintiff's conduct was disruptive and could have
16 had a negative impact on employee morale. DSOF, Ex. L at 3. McAndrew and plaintiff
17 agree that McAndrew decided to terminate plaintiff that same day.

18 According to plaintiff, he did not write all of the names on his whiteboard, which was
19 only partially visible from outside his cubicle. He apparently had a habit of allowing affected
20 employees to list their names on his whiteboard for informational purposes during past
21 layoffs. He allowed people to list names based on speculation, which was common during
22 periods of reorganization. See PSOF, Ex. 1 at 135. Zlotnicka was told that she could find
23 out that the names of the affected employees by going to plaintiff's cubicle. She did not
24 think it was a major problem. PSOF, Ex. 7 at 161. According to Tutt, plaintiff put lists of
25 names on the board in the past and it had never bothered him because it seemed that it was
26 public knowledge. PSOF, Ex. 8 at 140.

27 On Thursday, November 1, plaintiff attended a human resources meeting on
28 redeployment conducted by Lewis. He made an audio recording of the meeting, which he

offers as evidence. PSOF, Ex. 29. Because "redeployment" was a new process within the company, a number of employees had questions for Lewis. Plaintiff asked a series of questions about whether and how employees would be provided with the reasons for their selection. Lewis said that he would have to talk to his supervisor about it. Plaintiff said he was not given an answer, which is why he was asking Lewis. She suggested going above his direct manager until he received a good reason, all the way to Tehrani. Plaintiff asked where he should go if he does not get an answer at that point. Lewis encouraged him to read defendant's open door policy. Plaintiff said that he had read it. Later, plaintiff asked whether employees would receive offers in writing if they found a new position. He also asked whether Lewis would be emailing the slides she was using during the presentation.

According to plaintiff, Lewis did not like his questions. Afterward, Lewis told McAndrew, who was not in attendance, that plaintiff had been disruptive during the meeting. PSOF ¶ 95. McAndrew says that Lewis's report supported his decision to terminate him. Tutt and Zlotnicka were at the meeting, and neither thought plaintiff's behavior was disruptive. Lewis says that she separately discussed terminating plaintiff with McAndrew, Tehrani, and legal counsel, and then gave the go ahead to terminate plaintiff. PSOF, Ex. 4 at 129-30. Around 3:00 P.M., McAndrew told plaintiff that he was being let go and walked him to the parking lot. Defendant continued to pay plaintiff through November 16, 2007, which was several weeks short of the end of the contemplated redeployment period.

Plaintiff alleges age discrimination and retaliation in connection with his selection for redeployment and subsequent termination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623(a)(1), (d). Defendant moves for summary judgment on both claims.

## II. Age Discrimination

The ADEA prohibits the use of age as the "but-for" cause of an adverse employment action. 29 U.S.C. § 623(a)(1); Gross v. FBL Fin. Servs., Inc., __ U.S. __, __, 129 S. Ct. 2343, 2352 (2009). Plaintiff contends that McAndrew selected him for redeployment because of his age. He may defeat summary judgment on this claim with sufficient direct

1 and circumstantial evidence of age discrimination or through the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See Enlow v. Salem-Keizer Yellow Cab Co., 389 F.3d 802, 812 (9th Cir. 2004). Under the latter approach, plaintiff must first show that he was at least 40, performing his job satisfactorily, subjected to an adverse employment action, and replaced by a substantially younger employee with equal or inferior qualifications. Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1207 (9th Cir. 2008). If plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. Id. If it does so, plaintiff must then show that this reason is pretext for discrimination, either directly by persuading the court that a discriminatory reason more likely motivated defendant or indirectly by showing that defendant's proffered explanation is unworthy of credence. Id. at 1212. Specific, substantial indirect evidence of pretext raises a triable issue. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Plaintiff argues that his evidence is sufficient to withstand summary judgment with or without the McDonnell Douglas framework. Unless plaintiff cannot establish a prima facie case under McDonnell Douglas, we need not consider his evidence separately. Defendant only challenges plaintiff's prima facie case based on an alternate test for reduction in force cases whereby an employee who is not replaced can still proceed if his discharge otherwise gives rise to an inference of age discrimination. Diaz, 521 F.3d at 1207-08. Plaintiff contends that he can meet the general test for replaced employees, however, and defendant does not renew its challenge in its reply. Because plaintiff presents a prima facie case, we will consider his evidence within the McDonnell Douglas framework.

At the second stage, defendant contends that McAndrew selected plaintiff for redeployment based on his assessment that Majerus had similar engineering skills and superior job performance and interpersonal skills. Defendant's proffered reasons are legitimate and non-discriminatory.

With the burden shifted back to plaintiff, he maintains that the age disparity, his subsequent termination, McAndrew's conduct, and comments allegedly made by defendant's

1 former Chief Executive Officer constitute direct evidence that age discrimination more likely
2 motivated defendant. We disagree. In the ADEA context, direct evidence is "evidence of
3 conduct or statements by persons involved in the decision-making process that may be
4 viewed as directly reflecting the alleged discriminatory attitude." Enlow, 389 F.3d at 812.

5 Plaintiff contends that the thirteen-year age difference between himself and Majerus
6 and the fact that he was the only redeployed employee under McAndrew to be terminated
7 amount to direct evidence of age discrimination. One of the employees in question chose to
8 retire, while the others obtained new positions. Were plaintiff to provide a relevant analysis
9 of the ages of the affected employees, which he does not, it would constitute indirect
10 evidence. This information does not show clear discriminatory animus.

11 Plaintiff also offers McAndrew's alleged comments confirming that plaintiff's job was
12 not going away, but was instead going to someone younger with less experience. Plaintiff
13 claims that these comments show animus in conjunction with McAndrew's refusal to provide
14 a reason for plaintiff's selection during their meeting and his failure to respond to plaintiff's
15 follow-up email. According to McAndrew, he had been instructed by human resources not
16 to provide specific reasons for redeployment decisions. Under the circumstances, in which
17 it was clear that McAndrew was not offering the relative age of plaintiff's replacement as a
18 reason for his selection, these statements do support a showing of animus.

19 Next, plaintiff points to comments allegedly made during a "town hall" question and
20 answer session with defendant's former CEO Michel Mayer on February 22, 2007. Plaintiff,
21 who was not able to attend, offers emails, a summary, and employee survey results to
22 establish Mayer's comments. Defendant objects to this evidence as inadmissible hearsay.
23 Mayer apparently said something to the effect that defendant's Arizona employees were
24 older with higher expectations and had a reputation for whining. Even if this evidence were
25 admissible, these "stray remarks" were not directly related to McAndrew's redeployment
26 decisions, and they constitute weak indirect evidence of discrimination at best. See Nesbit
27 v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993). We conclude that plaintiff does not
28

present a triable issue with respect to a discriminatory reason more likely motivating defendant.

Plaintiff also maintains that the process McAndrew used to select him for redeployment and plaintiff's superior qualifications, education, job performance, and experience render defendant's articulated reasons unworthy of credence. Plaintiff criticizes McAndrew's process due to his reliance on employee ratings instead of full performance reviews. He points to positive remarks in his past reviews and contends that his recent ratings were negatively impacted by the forced distribution policy, which prevented supervisors from giving high marks to everyone that they might have believed deserved them. He does not believe that his performance merited a bottom 25% rating. He also believes that McAndrew should have considered his Bachelor of Science degree and subsequent college course work in comparison with Majerus's two-year technician program and subsequent community college course work.

Moreover, plaintiff claims that McAndrew's process was faulty because he did not receive input from plaintiff's immediate supervisors, Tutt and Zlotnicka. Despite their lack of input, however, McAndrew says that he was aware of Tutt's assessment of plaintiff's interpersonal skills, which was highly critical by any measure. To be sure, Huang's criticism of plaintiff's interpersonal skills might have been tainted by her conflicts with plaintiff, Tutt, and Zlotnicka, but there is no indication that McAndrew did not honestly believe Huang's assessment or that it was otherwise influenced by age discrimination. Plaintiff might have deserved a more thorough vetting before he was selected for redeployment, but the ADEA does not mandate best practices, and the process McAndrew used does not suggest that defendant's proffered reasons are pretext for age discrimination.

Finally, plaintiff offers a comparison between his 29-year career in the industry and Majerus's 24-year career, and highlights his experience working with high frequencies. Plaintiff's career compares favorably, and there is no doubt that he had more experience operating the millimeter wave laboratory that he had personally developed. But the record does not suggest that Majerus was unqualified to assume plaintiff's responsibilities. Given

- 9 -

McAndrew's assessment of plaintiff's interpersonal skills, and considering all of the above evidence together, plaintiff does not present specific, substantial evidence of pretext. We grant defendant's motion for summary judgment on plaintiff's age discrimination claim.

### III. Retaliation

The ADEA also prohibits retaliation against employees for opposing unlawful age discrimination. 29 U.S.C. § 623(d). Plaintiff contends that McAndrew terminated him because he complained of age discrimination. To establish a retaliation claim, plaintiff must prove that he engaged in protected activity, suffered an adverse employment action, and there was a causal link between the two events. Poland v. Chertoff, 494 F.3d 1174, 1179-80 (9th Cir. 2007). As above, plaintiff may rely on the McDonnell Douglas framework at the summary judgment stage with the same three elements constituting the prima facie case. Defendant must then articulate a legitimate, non-retaliatory reason for the challenged action. Plaintiff has the ultimate burden of directly or indirectly demonstrating that this reason is pretext for retaliation.

First, defendant challenges plaintiff's ability to show that he engaged in activity protected under the ADEA. An employee complaining of age discrimination in violation of the ADEA must reasonably put his employer on notice that he is engaging in protected activity, but he need not utter magic words. See Kitchen v. WSCO Petroleum Corp., 481 F. Supp. 2d 1136, 1145 (D. Or. 2007).

Plaintiff contends that he engaged in protected activity when he told McAndrew that his rights were being violated and that McAndrew would be dealing with plaintiff's lawyer. Plaintiff allegedly made these comments in the context of McAndrew confirming that a younger employee with less experience would be replacing plaintiff. Plaintiff also offers his follow-up email to McAndrew, which asks for acknowledgment of the comments about age and experience, but does not mention a violation of plaintiff's rights or a lawyer. Defendant initially disputes that these comments were specific enough to place McAndrew on notice that plaintiff was opposing age discrimination, in part because he did not mention "age

discrimination." These alleged comments are sufficient to qualify as protected opposition at the prima facie stage.

Plaintiff also argues that his use of his whiteboard to investigate and collect the names of other employees selected for redeployment was protected activity. Defendant correctly points out that this explanation for the names on the whiteboard contradicts plaintiff's deposition testimony that the names were posted merely for informational purposes during times of organizational change. PSOF, Ex. 1 at 137-38. It also contradicts plaintiff's position that he facilitated the list of names on his whiteboard, but did not take an active role in writing the names or soliciting people to generate a list of redeployment employees. See PSOF, Ex. 10 at 3. Because there is no support in the record, plaintiff may not characterize his use of his whiteboard as protected activity.

Finally, plaintiff maintains that his questions for Lewis during the November 1, 2007 redeployment meeting qualify as protected activity. His questions concerned whom he should ask about the reasons for his selection for redeployment. Defendant objects on the grounds that plaintiff did not offer this theory when asked about his retaliation claim during his deposition. It also contends that Lewis could not have reasonably construed plaintiff's questions as opposing age discrimination. However, the parties agree that Lewis recounted plaintiff's questions to McAndrew along with her complaints about plaintiff's behavior during the meeting, and McAndrew might reasonably have understood plaintiff's questions as a continuation of his earlier comments. Of course, plaintiff agrees with McAndrew that he had made the decision to terminate plaintiff the day before the redeployment meeting took place, but that goes to the issue of causation. In any case, plaintiff can establish the first element of his prima facie case.

Second, defendant disputes plaintiff's proffered adverse employment action. Plaintiff contends that he was terminated on November 1, 2007, the day McAndrew walked him to the parking lot. Defendant claims that plaintiff remained eligible for internal job openings, and it points out that it continued to pay him until November 16, 2007. Plaintiff maintains that this was not the case, and he disputes his eligibility for a severance package that

defendant offered him. It is undisputed that plaintiff was terminated at least several weeks before he otherwise would have been if he had not secured another position, which is sufficient to show an adverse employment action at the prima facie stage.

Third, defendant argues that plaintiff cannot show a causal link between his protected activity and his termination. At the prima facie stage, the causal link element is construed broadly, Poland, 494 F.3d at 1181 n.2, and, in some cases, causation may be inferred "from timing alone where an adverse employment action follows on the heels of protected activity." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002). Notwithstanding the short duration involved in this case, defendant contends that plaintiff's use of his whiteboard and his conduct at the redeployment meeting are intervening events that break the causal chain. In addition, defendant suggests that McAndrew's efforts to locate a position for plaintiff, as shown through their exchange of email and a telephone message, belie any inference of retaliation. Defendant submits these reasons, as well as McAndrew's reliance on complaints from Tehrani and Lewis, as legitimate and non-retaliatory for purposes of the second stage of the McDonnell Douglas framework, should we conclude that plaintiff can establish a prima face case.

In addition to timing, plaintiff asserts that the events were causally linked because defendant's reasons are pretext for retaliation. Plaintiff points out that no one asked him about his whiteboard or confirmed that he was responsible for the list of names that appeared on it before he was terminated. He also points out that Zlotnicka did not have a major problem with his use of his whiteboard, and Tutt had not been bothered by it in the past. Moreover, plaintiff argues that defendant should have used progressive discipline under its "Corrective Action" policy, which allows for counseling, documented warnings, final documented warnings, and termination, all within the discretion of management. PSOF, Ex. 40 at 1. Although plaintiff concedes that Lewis did not seem receptive to his questions at the redeployment meeting, he contends that the complaint she made to McAndrew was overblown in light of the audio recording of the meeting and Tutt's and Zlotnicka's testimony that plaintiff's conduct was not disruptive. Plaintiff submits the same analysis of

- 12 -

pretext for purposes of the third stage of the McDonnell Douglas framework, along with all of the evidence discussed above.

In light of the low evidentiary threshold required, and the similarity of the arguments made at all three stages of the burden-shifting framework, we will assume, without deciding, that plaintiff can show a causal link, and thus establish a prima facie case. Plaintiff's evidence of pretext, however, is insufficient to defeat summary judgment. Plaintiff concedes that he allowed the speculative listing of employees on his whiteboard with the connotation that they had been redeployed. Moreover, he envisioned other employees coming to his cubicle to view the list and add to it. McAndrew's condemnation of such inappropriate behavior in the workplace is unremarkable. There is no indication that he harbored any discriminatory or retaliatory animus toward plaintiff. Indeed, he was helping plaintiff find a new position until he found out about plaintiff's whiteboard, apparently from his new supervisor, Tehrani. Under the circumstances, McAndrew's decision to forgo intermediate discipline and terminate plaintiff short of the end of the redeployment period does not suggest pretext. Plaintiff's exhaustive, if not confrontational, questioning of Lewis the following day may have been understandable given the subject matter of the meeting. But plaintiff concedes that the decision to terminate him had already been made the day before, and he cannot show that defendant's reasons are pretext for retaliation. We grant defendant's motion for summary judgment on plaintiff's retaliation claim.

Pursuant to our Order of May 28, 2010 (doc. 105), **IT IS ORDERED GRANTING** defendant's motion for summary judgment on all of plaintiff's claims (doc. 52).

The clerk shall enter judgment in favor of defendant and against plaintiff.

DATED this 2nd day of June, 2010.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge